UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**COMBO MARITIME, INC.**                                **CIVIL ACTION**

**VERSUS**                                                                        **No. 08-3926**

**U.S. UNITED BULK TERMINAL, LLC;**               **SECTION I/3**
**U.S. UNITED BARGE LINE, LLC;**
**UNITED MARITIME GROUP, LLC, in**
**personam; M/V MARLENE ELLIS and**
**M/V BRENDA KOESTLER, in rem**

## ORDER AND REASONS

Before the Court is a motion for partial summary judgment, filed on behalf of third-party defendant Carnival Corporation ("Carnival").[1] Defendants/third-party plaintiffs, U.S. United Bulk Terminal, LLC, U.S. United Barge Line, LLC, and United Maritime Group, LLC (collectively, "United"), have opposed the motion.[2] Carnival has filed a reply brief.[3] Plaintiff, Combo Maritime, Inc. ("Combo"), has also filed a memorandum in support of Carnival's motion.[4] For the following reasons, Carnival's motion is **GRANTED IN PART**.

### *BACKGROUND*

Combo filed its complaint against United and the vessels M/V MARLENE ELLIS and

---

[1] R. Doc. Nos. 28, 28-2, Carnival mem. supp.

[2] R. Doc. No. 41, mem. opp'n.

[3] R. Doc. No. 42, Carnival reply.

[4] R. Doc. No. 40, Combo mem. supp.

M/V BRENDA KOESTLER on July 14, 2008.[5] Combo alleged that its vessel, the M/V ALKMAN, was struck and damaged by United's loose drifting barges in the early morning of February 28, 2008.[6] Combo further alleged that these barges had broken free from United's barge fleeting area on the Mississippi River.[7] Combo alleged that the damage to the ALKMAN was caused by United's negligence in its failure to properly and safely maintain and secure the barges in its barge fleet.[8]

On September 10, 2008, United filed an answer and asserted a third-party complaint for indemnity and contribution against Carnival and the cruise ship M/V FANTASY.[9] United alleged that on the morning of February 28, 2008, the FANTASY navigated at an excessive speed and inappropriately close to United's barge fleet.[10] It alleged that this improper navigation caused "wave action, wheel-wash, suction, and other effects," which caused the barges to break away and damage the ALKMAN and United's property.[11] United also tendered Carnival and the FANTASY to Combo pursuant to Federal Rule of Civil Procedure 14(c).[12] United alleged that Carnival and the FANTASY were directly liable to Combo for the damage to the ALKMAN

---

[5] R. Doc. No. 1, compl.

[6] Id. ¶8.

[7] Id. The MARLENE ELLIS and BRENDA KOESTLER are United's tugboats assigned to the fleeting area.

[8] Id. ¶9.

[9] R. Doc. No. 6, third-party compl.

[10] Id. ¶4.

[11] Id. ¶¶5-7.

[12] Id. ¶10.

based on improper navigation by the FANTASY.[13]

On November 3, 2008, Carnival answered United's complaint.[14] Carnival, meanwhile, filed its own fourth-party complaint against Chemikalien Seetransport GmbH, Yokmar Maritime, Oceanstar Management, Inc., MV CHEMTRANS STAR, and M/V EVI.[15] Carnival alleged that the CHEMTRANS STAR and EVI navigated past United's barge fleet after the FANTASY and that those vessels in fact passed one another at the same time as they passed the barge fleet.[16] Because Carnival's motion focuses on the alleged inadequacies of United, the allegations contained in its fourth-party complaint are immaterial to the resolution of the motion.

Carnival filed its motion for partial summary judgment on March 17, 2009. In its motion. Carnival asks this Court to enter judgment holding United liable for Combo's damages and to dismiss United's claims against Carnival and the FANTASY.

*LAW AND ANALYSIS*

I. **STANDARD OF LAW**

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those

---

[13] Id.

[14] R. Doc. No. 10.

[15] R. Doc. No. 23, fourth-party compl.

[16] Id. ¶14.

portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. Celotex, 477 U.S. at 323; Fontenot v. Upjohn Co., 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. Id. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." Id. at 255; see Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

## II. DISCUSSION

Carnival argues that United cannot overcome the presumption of fault imposed by James v. River Parishes Company, Inc., 686 F.2d 1129 (5th Cir. 1982). James holds that the custodian

4

of a drifting vessel which causes damage bears the burden of disproving fault. Id. at 1133.
United responds that the evidence in the record shows that the incident could have been
prevented but for the actions of the FANTASY. United claims that its barge mooring system
was more than adequate and that the FANTASY's failure to reduce speed or change course
caused the breakaway.

A.    *Presumption of Fault*

In James, the Fifth Circuit adopted a presumption applicable against a drifting vessel
which causes damage:

> When a drifting vessel causes damage, an inference arises as a
> matter of law that the vessel was adrift through negligence. Such
> an inference is called a presumption. The custodian of the drifting
> vessel bears the burden of disproving fault by a preponderance of
> the evidence. In other words, he bears the risk of non-persuasion.
> This inference or presumption of negligence is a rule of law based
> on the logical deduction that a vessel found floating loose was
> improperly moored.

Id. at 1132-33. "To rebut the presumption of negligence, [the drifting vessel] must show that it
was without fault or that the breakaway was inevitable." Am. River Transp. Co. v. Morton Int'l,
Inc., No. 06-6103, 2008 WL 2597924, at *3 (E.D. La. June 26, 2008) (Feldman, J.) (citing
Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 795 (5th Cir. 1977)). The drifting vessel
"must exhaust every reasonable possibility which the circumstances admit and show that in each
[it] did all that reasonable care required." Id. (quoting Bunge Corp., 558 F.2d at 795) (internal
quotation marks omitted) (alteration in original).

Placing the burden of proving absence of fault or inevitable accident on the drifting

vessel "is appropriate when a drifting vessel collides with an anchored vessel because the circumstances suggest equally strongly that the drifting vessel is at fault. In any case, the drifting vessel can more easily produce evidence to absolve itself of responsibility." James, 686 F.2d at 1132 n.2. "The vessel must show that the accident could not have been prevented by 'human skill and precaution and a proper display of nautical skills.'" Id. at 1132.

1. Mooring System

United first contends that its mooring system was adequate in its design and that it was properly maintained. Because the mooring system was sufficient, United argues, it cannot have been the cause of the breakaway. United provides evidence of its maintenance procedures and of the overall design of the system.

A brief description of United's fleeting operation and the mooring system, taken from United's brief, is in order.

> United operates a dry-bulk handling facility located in Davant, Louisiana, on the east bank of the Mississippi River, near Mile 55.4 LMR. The facility includes a transfer dock and barge fleeting areas, upriver and downriver of the transfer dock. The fleeting tiers below United's transfer dock include, but are not limited to, three fleeting buoys, commonly referred to as Buoys #1, #2, #3. The buoys have been in existence since the early 1980s. The buoys are just upriver of the Davant Anchorage, which was the location of the M/V ALKMAN on February 28, 2008. The three mooring buoys at United's lower fleet are held in position with 5-ton anchors. Barges are secured to the buoys with 1 ½" galvanized wires, which are attached to two 10' shock lines with 40 and 55-ton shackles connecting the shock line to a padeye on the top side of the buoy.

Each buoy is capable of securing a number of barges, referred to as a "block." It is undisputed

that the mooring of buoy no. 1 failed first. Block no. 1 then drifted into block no. 2, causing block no. 2's mooring system to fail and the barges to go adrift. Barges from block no. 1 and block no. 2 then drifted into block no. 3, whose mooring system then failed, causing its barges to break away.[17] At the time of the breakaway, block no. 1 contained 25 barges, block no. 2 contained 28 barges, and block no. 3 contained approximately 9 barges.[18]

Each buoy is secured to the river bottom by a chain and 5-ton anchor.[19] The chain is connected to the underside of the buoy by a 55-ton shackle and padeye. On the topside of the buoy, the padeye is connected to three 55-ton shackles. Two of those shackles are in turn connected to a nylon shock lines. The shock lines securing buoy no. 1 were each 12 inches in diameter, and the shock lines securing buoy no. 2 were each 14 inches in diameter.[20] The shock lines are each connected to wires, which secure a single barge. Additional barges are in turn secured to that barge.[21]

The record shows that at least one of the nylon shock lines failed on buoy no. 1.[22] Following the incident, United placed the failed mooring components on a pallet on its dock

---

[17] R. Doc. No. 28-3, Carnival's stmt. of facts ¶12 (admitted by United at R. Doc. No. 41-7 ¶12)

[18] R. Doc. No. 41-3, ex. B, Ruiz dep. at exhibit 6; R. Doc. No. 40-9, Assavedo dep. at 238-39.

[19] R. Doc. No. 28-6, ex. B.

[20] Assavedo dep. at 237-38.

[21] R. Doc. No. 28-6, ex. B.

[22] See Ruiz dep. at 61-62; Assavedo dep. at 195. There is conflicting testimony whether one or both of buoy no. 1's shock lines failed.

barge.[23] At some point thereafter, the components went missing.[24]

*i.  Maintenance Routine*

United contends that its mooring system was renewed following Hurricane Katrina and that it was thereafter regularly maintained. Following Hurricane Katrina in August, 2005, United replaced buoys no. 2 and no. 3 in its fleet operation and the topside components of buoy no. 1.[25] United replaced the wires and shock lines for buoy no. 1 at some point in mid-2007.[26]

United conducts a maintenance routine — dubbed a "fleet check" — which consists of checking all buoy wires, buoy lines, and piling lines within its fleet.[27] Paul Ruiz ("Ruiz"), captain of United's tug MARLENE ELLIS, testified that he conducts a fleet check every three hours.[28] Ruiz's deckhand, Paul Morin ("Morin") would also conduct fleet checks while on duty. These checks are done to ensure that the shock line, cable, or shackles are not damaged and that the piling lines are secured.[29]

On February 27, 2008, prior to the breakaway, United conducted three fleet checks, the

---

[23] Assavedo dep. at 194-95.

[24] Carnival and Combo urge the Court to adopt an adverse inference against United due to the missing components evidence. The fact that these parts are missing, however, works naturally to United's disadvantage as it bears the burden of disproving its fault, discussed infra. Had the parts been properly preserved, United could rely on them to attempt to carry its burden.

[25] Id. at 58.

[26] Id. at 61.

[27] Ruiz dep. at 13; Assavedo dep. at 175.

[28] Ruiz dep. at 13.

[29] R. Doc. No. 41-4, ex. C, Morin dep. at 10.

8

first from 0715 to 0750, the second from 1630 to 1700,[30] and the third from 1945 to 2015.[31] The record does not suggest that these fleet checks disclosed any problems with the mooring equipment.

Although United's evidence shows that it adhered to regular maintenance procedures, the Court finds that evidence alone insufficient to overcome the presumption against United. That United replaced its damaged equipment following Hurricane Katrina and routinely verified the integrity of that equipment does not persuade the Court that United did all that reasonable care required. Indeed, the principal allegation lodged against United is that its mooring equipment was inadequate to withstand the forces to which it was subjected. Carnival argues that the fact that buoy no. 1 failed initially, whereas buoy no. 2 and buoy no. 3 failed only after impact with drifting barges, shows that buoy no. 1's equipment was substandard. The fact that United monitored the integrity of that equipment does not establish its adequacy or otherwise satisfy the burden imposed by James.

ii.     *Mooring Components*

United's engineering expert, Richard Wright ("Wright"), reviewed documents concerning the components in place at the time of the breakaway.[32] He opined that the "equipment in service on the date of the incident is considered to be engineeringly adequate for the mooring of the 25 loaded barges under static conditions, and it is our opinion that an external

---

[30] Ruiz dep., ex 1.

[31] Id. at ex. 2.

[32] R. Doc. No. 41-6, ex. A, Wright report at 1.

9

force of some substantial magnitude resulted in the failure of the 'shock line' and 40 ton shackle on buoy #1."[33] Ruiz also testified that United did not have problems in the normal course of ships passing by its barge fleet.[34]

Wright's opinion merely states that the mooring equipment was adequate for static conditions. As Ruiz, himself, testified, ships would pass the United fleet on a nearly constant basis. Nowhere does Wright define "static conditions" or elaborate on the conditions to which the mooring equipment was actually subjected. Meanwhile, the shock line's failure due to an external force is effectively conceded by Carnival, i.e., no party seriously suggests that the moorings failed of their own accord, absent any external force.[35] The question is not whether an external force caused the shock line to fail. Instead, the key questions are (1) whether the shock line and other components were adequate to withstand an external force equivalent to the force allegedly generated in this case; and (2) whether the external force exerted upon United's mooring system was the result of another party's negligence. Wright's opinion of the mooring equipment's adequacy sheds no light on the answer to either of those questions and it is, therefore, not sufficient to satisfy the burden imposed by James.

2.  Passing Vessel's Duty

United next argues that Carnival breached its duty to avoid creating unusual swells or

---

[33] Id. at 2.

[34] Ruiz dep. at 76.

[35] Although Wright opines that the shock line's failure owes to "an external force of some substantial magnitude," he does not address whether the FANTASY exerted a force of "some substantial magnitude."

10

suction that could cause damage to properly moored vessels.[36] United cites <u>Shell Pipeline Corp. v. M/T CYS ALLIANCE</u>, 1982 A.M.C. 389 (E.D. La. June 30, 1981), for the following proposition:

> A ship passing piers or docks where other vessels are tied up is obligated to proceed carefully and prudently so as to avoid creating unusual swells or suctions which would damage craft properly moored or installations along the shoreline. The moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water and must take such precautions by way of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage.

<u>Id.</u> at 395 (<u>quoting</u> <u>O'Donnell Transp. Co. v. M/V Maryland Trader</u>, 228 F. Supp. 903, 909 (S.D.N.Y. 1963)). United claims that the FANTASY, as captained by Thomas Bryan ("Bryan"), did not navigate in a prudent manner to avoid damages to the barges and, ultimately, the ALKMAN.

United points out Bryan's familiarity with the location of United's fleet[37] and his general awareness that he must pilot the FANTASY at a prudent speed.[38] Bryan further testified that, when it passed United's fleet, the FANTASY was traveling at a "full ahead" speed of at least 12 knots.[39] He testified that before passing the fleet, he communicated with an oncoming vessel and, in order to avoid a collision, the FANTASY changed course to the starboard, which brought the FANTASY in "close proximity" of the fleet.[40] When asked whether it would have been

---

[36] Mem. opp'n at 11.

[37] R. Doc. No. 41-5, ex. D, Bryan dep. at 41-42.

[38] <u>Id.</u> at 89.

[39] <u>Id.</u> at 103-04.

[40] <u>Id.</u> at 99-102.

prudent to reduce speed to "half ahead," Bryan stated that "it depends on the situation" and he could not answer affirmatively or negatively.[41]

Meanwhile, Ruiz testified that he had "never seen" a ship pass as close to United's fleet as the FANTASY had passed.[42] Morin provided similar testimony that he had "never seen a ship that close to our fleet before."[43] When asked how close the FANTASY came to United's fleet, Ruiz responded:

> "I was, had to be a hundred, 150 feet off my fleet and he was 150 feet, 200 feet off of me.
> So 400, 450 off the barges, off our fleet.
> And normally they pass way out in the middle of the river."[44]

Morin testified that the FANTASY was approximately 250 feet from the MARLENE ELLIS, which was approximately 100 feet from the outer boundary of United's fleet.[45]

The cumulative testimony establishes, for present purposes, that: (1) Bryan was familiar with the fleet's location; (2) the FANTASY's speed was at least 12 knots when it passed the fleet; (3) the FANTASY was in "close proximity" of the fleet, somewhere between approximately 350 and 450 feet, when it passed; and (4) neither Ruiz nor Morin had seen a vessel pass that close to the fleet.

United contends that this evidence is sufficient to withstand summary judgment as it

---

[41] Id. at 105.

[42] Ruiz dep. at 35.

[43] Morin dep. at 18.

[44] Ruiz dep. at 35.

[45] Morin dep. at 19.

shows that the FANTASY was not navigated in a prudent manner as it passed the fleet.[46]
Carnival responds that the Shell Pipeline case, cited by United, is inapposite as the rule of that case presupposes that the damaged vessels were properly moored. Here, Carnival argues, the Court cannot operate on a similar assumption of proper mooring.

Carnival's argument is persuasive in light of James. As the Shell Pipeline court noted, "piers and docks along the shoreline are required to be kept in proper condition and vessels tied up there must be seaworthy and properly moored so as to resist ordinary and normal swells in narrow waters where heavy traffic may be anticipated." Shell Pipeline, 1982 A.M.C. at 395-96 (quoting O'Donnell Transp., 228 F. Supp. at 909). However, the Court need not resolve the applicability vel non of Shell Pipeline because it finds, even were Shell Pipeline to apply, that United has not shown that the FANTASY was navigated imprudently.[47] That the FANTASY came within 350 feet of United's fleet while traveling at a rate of 12 knots does not persuade the Court that it was navigating imprudently.

The Court notes that United has not provided any testimony, expert or otherwise, which would establish that the force exerted by the FANTASY was excessive, relative to the normal forces sustained by United's mooring system. Nor is there evidence that the FANTASY's speed was any faster (or slower) than other vessels in the area. The Court cannot infer from the testimony provided, as United would have it, that the FANTASY was navigated imprudently

---

[46] Mem. opp'n at 13.

[47] The Court recognizes that Shell Pipeline can be read to impose the burden of proof upon the navigating vessel to show prudent navigation. However, James — and its presumption of fault and accompanying burden of nonpersuasion imposed upon the drifting vessel — guides the present analysis. Accordingly, in the present context, the Court finds that the Shell Pipeline burden is reversed and that United must show that the FANTASY navigated imprudently. Further, Shell Pipeline was decided in 1981, prior to the Fifth Circuit's opinion in James adopting the presumption of fault against the drifting vessel.

when it passed by the fleet at the speed that it was traveling. The allegations of imprudent navigation of the FANTASY are insufficient to satisfy the burden imposed by James.

III. CONCLUSION

United has not satisfied the burden of disproving fault by a preponderance of the evidence. See James, 686 F.2d at 1133. Therefore, United's allegations that Carnival's negligence caused damage to United's fleet and to the ALKMAN must be dismissed. As a result, United's Rule 14(c) claim for indemnity or contribution against Carnival and United's Rule 14(c) demand for judgment in favor of Combo and against Carnival both fail, and United's third-party complaint must be dismissed.

However, it is inappropriate to enter a judgment finding United liable for Combo's damages as Carnival, not Combo, has moved for partial summary judgment.[48] At trial, United will not be permitted to argue or present evidence that Combo's damages were in any way caused by Carnival. United will, however, be permitted to assert any other defenses against Combo's claims that have been properly preserved in this litigation.

Accordingly,

**IT IS ORDERED** that the motion for partial summary judgment is **GRANTED** insofar as it seeks dismissal of United's claims against Carnival and the FANTASY and United's demand for judgment in favor of Combo and against Carnival and the FANTASY.

**IT IS FURTHER ORDERED** that United's third-party complaint filed against Carnival

---

[48] Combo filed a memorandum in support of Carnival's motion urging the Court to find United liable for Combo's damages. The proper avenue to obtaining such relief, however, would have been for Combo to file a timely motion for summary judgment on its claims against United.

and the FANTASY is **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, June 3, 2009.

	_____
	**LANCE M. AFRICK**
	**UNITED STATES DISTRICT JUDGE**